## STATE v. ROBERT SIIRILA.*

193 N. W. 2d 467.

December 10, 1971—No. 42054.

*C. Paul Jones,* State Public Defender, *Roberta K. Levy,* Assistant State Public Defender, and *Earl K. Gray,* for appellant.

*Warren Spannaus,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* and *David G. Roston,* Assistant County Attorneys, for respondent.

*James V. Reeves, Thomas W. Tinkham,* and *Jon F. Tuttle,* for Legal Advice Clinics of Minneapolis, Ltd., amicus curiae.

---

KNUTSON, CHIEF JUSTICE.

Defendant, after waiving jury trial in open court, was convicted of possession of a narcotic drug, Cannabis Sativa L., commonly known as marijuana, in violation of Minn. St. 1969, §§ 618.01, 618.02, and 618.21, subd. 1.

Section 618.02 reads:

"Except as authorized by this chapter it shall be unlawful for any person to sell, prescribe, administer, dispense or furnish to a minor, or manufacture, possess, have under his control, sell, prescribe, administer, dispense, or compound any narcotic drug."

Cannabis Sativa L., which will be referred to hereinafter as marijuana, is defined by § 618.01, subd. 23, and included as a narcotic drug by § 618.01, subd. 14. Section 618.21 provides penalties for violation of these statutes.[1]

A warrant was obtained by the Minneapolis Police Department on October 25, 1968, to search one "Bob Jones, described as WM, 5'10", 170#, long black hair, mustache and beard," for drugs and narcotic paraphernalia. Probable cause for the search warrant was based upon information received from a reliable informant. "Bob Jones" had been identified several days before as having in his possession marijuana and LSD. One of the police officers had suggested that "Bob Jones" was merely an alias for a man known to the police for narcotics violations as Robert Reed, Jr.

On the night the warrant was issued, the police received a call from their informant stating that "Jones" would be near or at the corner of 5th Street and Cedar Avenue in Minneapolis that evening, in front of Richter's Drug Store; that he would be wearing a black leather jacket; and that he would be in the company of a person who would be wearing a green-and-gold plaid shirt.

Armed with the search warrant, four officers left the police station in two teams. One team arrived at 5th and Cedar between

---

[1] These sections were repeated by § 22 of L. 1971, c. 937, which amended laws relating to narcotics as will be noted hereinafter.

8 and 8:30 p. m. and observed an individual, who turned out to be defendant, standing on the corner in front of Richter's Drug Store. They recognized him from the description of his person and attire as the person described in the warrant although neither officer had any independent knowledge of his identity. Officer Veryl Burchett testified that defendant looked into the officers' car and immediately turned around and walked rapidly away and into the drugstore. The officers drove their car around the corner and shortly thereafter walked into the drugstore. The other two officers arrived at 5th and Cedar about the same time but they did not observe defendant or the other person who had been described to them. One of the officers entered the drugstore and observed defendant, wearing a black leather jacket, and another person, wearing the clothing the informant had described, sitting together at the counter. The officer left the drugstore, returned to the car, and, with his companion officer, returned to the drugstore. When they arrived there, defendant was in a phone booth. An off-duty officer who happened to be present stated that he knew "Bob Jones" and pointed defendant out to the other officers.

Two of the officers approached defendant at the telephone booth, identified themselves, and inquired whether he was "Bob Jones." He answered that he used that name but that his real name was Bob Siirila. He was taken into a back room of the drugstore and searched, but nothing was found. The officers then took him to their car, where they searched him once more and found nothing. Defendant was then taken to the police station, where his coat was removed and examined, and the officers found what appeared to be traces of a green, plant-like substance, similar to marijuana. Defendant was then placed under arrest for possession of marijuana.

The substance found in defendant's jacket was examined by a chemist of the Minneapolis Public Health Service, who testified that it was marijuana. There were less than 20 milligrams

altogether. The chemist testified that she could determine that the substance was marijuana by a comparative microscopic test.

Defendant had been previously arrested on October 16, 1968. He testified that the leather jacket he was wearing on the night of his present arrest had been vacuumed and cut open to search the lining for narcotics, sometime between his arrest of October 16 and his release and the return of his jacket to him on October 18, but that nothing was found.

After conviction, defendant was sentenced to the Youth Conservation Commission for an indeterminate term on December 20, 1968.

The main thrust of defendant's argument on this appeal is that possession of an unusable quantity of marijuana does not constitute a crime. He relies mainly on our decision in State v. Resnick, 287 Minn. 168, 177 N. W. 2d 418 (1970) and State v. Morgan, 287 Minn. 406, 178 N. W. 2d 697 (1970).

Our decision in Resnick is based for the most part on a determination that the evidence of *possession* of a narcotic was insufficient to sustain the conviction. We said (287 Minn. 169, 177 N. W. 2d 419) :

"There is no evidence whatever that defendant was in actual possession of any narcotic drug on August 29, 1968, the date specified in the information. A leather briefcase was discovered inside a suitcase found in the trunk of a Corvair automobile owned by one Patricia Simon, and there was evidence from which the trial court could have concluded that defendant was in possession of a key which afforded access to this car. There were identifying materials in the suitcase and the briefcase which could have justified the inference that these objects were owned by defendant. The investigating authorities were able to extract from the interstices of the briefcase a small quantity of a material which they identified as 'marijuana.' The state acknowledges that this material was so minimal in quantity as to be unusable for any purpose having a narcotic effect.

"In this situation, we believe, a verdict of guilty which exposes

the defendant to a possible sentence of 'imprisonment in a state penal institution for not less than five nor more than 20 years' (§ 618.21) cannot be sustained. It is possible, perhaps, to argue that defendant was in possession of the briefcase from which the 'marijuana' was extracted because he had a key to the car trunk in which the briefcase was found and the car was owned by a girl with whom defendant was living at the time. *But we do not believe that a marginal finding of constructive possession of the briefcase is adequate to support the additional conclusion that defendant was in possession or control of a reprehensible narcotic drug merely because an unusable quantity of a plant which grows in the state was found, upon meticulous examination, to be lodged in the crevices of this receptacle.* There are drugs which are in Minnesota so exotic in character as to justify, perhaps, the inference that a tenuous possession of the substance in any amount bespeaks illegal possession or control. But we do not believe this to be the case with respect to marijuana, and we cannot sustain this conviction on the basis of the record before us." (Italics supplied.)

Apparently, we did couple the. conclusion that insufficiency of proof of possession would not sustain a conviction with the fact of possession of the minimal quantity of narcotics found by the state in Resnick. Had there not been a lack of sufficient proof of possession, the decision would have been more in point with the case now before us.

Apparently, Morgan was based on the quoted portion of the statement from Resnick which indicates that possession of an unusable quantity of marijuana would not sustain a conviction. We did not try to distinguish the two cases. Our decision in Morgan does not discuss the facts upon which it is based, but an examination of the records and briefs filed here leads us to the conclusion that the facts in Morgan and those in the present case are indistinguishable.

In both Resnick and Morgan we were searching for. legislative intent. It is a legislative function to say what acts shall consti-

tute a crime. That is as true of narcotics laws as of any other. In Morgan, we came to the conclusion that the legislature did not intend possession of a minimal unusable quantity of marijuana to be a felony punishable by 20 years' imprisonment.

Since our decision in Resnick and Morgan and the hearing on the case now before us, the legislature has again been in session. It had the opportunity to follow our decisions and to eliminate possession of an unusable quantity of marijuana as a crime. It did not do so. Instead, it enacted L. 1971, c. 937, as a new, comprehensive chapter on narcotics, repealing the old laws under which Resnick, Morgan, and the present case were decided. The significant parts of c. 937 are:

Section 4, amending Minn. St. 1969, § 152.01, by adding subd. 9, defining marijuana as follows:

" 'Marijuana' means all parts of the plant Cannabis sativa L., including all agronomical varieties, whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin, but shall not include the mature stalks of such plant, fiber from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks, except the resin extracted therefrom, fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination."

Section 11, amending § 152.01 by adding subd. 16, which reads:

" 'Small amount' as applied to marijuana means 1.5 ounces or less. This provision shall not apply to the resinous form of marijuana."

Section 17, amending § 152.15 by adding a new subd. 1 and amending subd. 2. Subd. 1, clause (5), provides:

"The distribution of a small amount of marijuana for no remuneration, shall be treated as provided in subdivision 2, clause (4) of this section."

Subd. 2, so far as material, provides:

"Any person who violates section 152.09, subdivision 1, clause (2) with respect to:

\* \* \* \* \*

"(4) A substance classified in Schedule V, or a small amount of marijuana is guilty of a crime and upon conviction may be imprisoned for not more than one year, fined not more than $1,000, or both; \* \* \*."

It is apparent that the legislature reduced the crime of possession of a small amount of marijuana as defined above from a felony to a gross misdemeanor but it did not declare possession of an unusably small amount no crime at all. It follows that under the new law possession of even a small amount of marijuana is still a crime. It must now be assumed that by adoption of c. 937 the legislature in effect reaffirmed what was intended to be the law prior thereto, contrary to what we concluded was the legislative intent when we decided Resnick and Morgan.

This conclusion is fortified by the action taken by the legislature at its 1971 Special Session. The new subd. 16 added to Minn. St. 152.01 by § 11 of c. 937 was amended identically by Ex. Sess. L. 1971, c. 38, § 1 (Ex. Sess. Senate File 137) and by Ex. Sess. L. 1971, c. 48, § 17 (Ex. Sess. House File 178, § 17)[2] to read:

" 'Small amount' as applied to marijuana means 1.5 ounces *avoirdupois* or less. This provision shall not apply to the resinous form of marijuana." (Italics supplied.)

The only change from the definition of "small amount" in subd. 16 as originally adopted was the addition of the word "avoir-

[2] Ex. Sess. House File 178 was adopted in the House October 29 by a vote of 121 to 9 (Ex. Sess. Journal of the House, 1971, pp. 650, 651). The same day, it was adopted in the Senate by a vote of 61 to 0 (Ex. Sess. Journal of the Senate, 1971, pp. 650, 651). Ex. Sess. Senate File 137 was adopted in the Senate October 19 by a vote of 57 to 0 (Ex. Sess. Journal of the Senate, p. 507), and on October 29 it was adopted in the House by a vote of 130 to 0 (Ex. Sess. Journal of the House, pp. 652, 653).

dupois" to clarify the weight to be used in determining what is a small amount.

Before its adoption, an attempt was made to amend § 17 of Ex. Sess. H. F. 178. Representative William R. Ojala moved to insert, in lieu of the language quoted above, the following:

" 'Small amount' as applied to marijuana means *a useable amount, but not in excess of* 1.5 ounces (OR LESS) *troy weight.* This provision shall not apply to the resinous form of marijuana."

This motion was defeated (Ex. Sess. Journal of the House, 1971, pp. 649, 650).

Had the Ojala motion been adopted, it would in effect have adopted the conclusion we arrived at in Morgan and Resnick, in so far as Resnick is based on the requirement that there be a usable amount before there is a crime. It is obvious that in adopting Ex. Sess. H. F. 178, § 17, and Ex. Sess. S. F. 137 and in rejecting the Ojala amendment the legislature in unmistakable terms declared possession of *any* amount of marijuana a crime. We see no escape from this conclusion.

Several states have passed on the question of whether it is necessary to possess more than an unusable quantity of marijuana in order to constitute a crime. The majority of the courts from jurisdictions that have adopted the Uniform Narcotic Drug Act, as has Minnesota, hold that the possession of *any* quantity of a proscribed drug constitutes a crime. Schenher v. State, 38 Ala. App. 573, 90 So. 2d 234, 237, certiorari denied, 265 Ala. 700, 90 So. 2d 238 (1956) ; Judd v. State, 482 P. 2d 273, 280 (Alaska, 1971) ; Duran v. People, 145 Colo. 563, 565, 360 P. 2d 132, 133 (1961) ; State v. Eckroth, 238 So. 2d 75, 77 (Fla. 1970); Peachie v. State, 203 Md. 239, 243, 100 A. 2d 1, 2 (1953) ; State v. Young, 427 S. W. 2d 510, 512 (Mo. 1968); State v. Humphreys, 54 N. J. 406, 410, 255 A. 2d 273, 275 (1969) ; State v. Winters, 16 Utah 2d 139, 143, 396 P. 2d 872, 875 (1964) ; Robbs v. Commonwealth, 211 Va. 153, 176 S. E. 2d 429, 430 (1970); State v. Dodd, 28 Wis. 2d 643, 651, 137 N. W. 2d 465, 469 (1965). The only qualification

that some of these courts have placed upon the "any amount" standard is that the amount must be "measurable," e. g., Jordan v. United States, 416 F. 2d 338 (9 Cir. 1969). The New York court stated that if the sample was so small that it was entirely consumed by the state's tests and no sample was available for the defense to examine it could not be considered. People v. Pippin, 16 App. Div. 2d 635, 227 N. Y. S. 2d 164 (1962).

A small minority of courts have held that possession of a usable quantity of a proscribed drug is required to constitute a crime. State v. Moreno, 92 Ariz. 116, 374 P. 2d 872 (1962); Edelin v. United States, 227 A. 2d 395 (D. C. Court of Appeals 1967); Pelham v. State, 164 Tex. Cr. 226, 298 S. W. 2d 171 (1957); Russell v. Superior Court, 12 Cal. App. 3d 1114, 1117, 91 Cal. Rptr. 255, 256 (1970). See, also, dissent in Duran v. People, 145 Colo. 563, 567, 360 P. 2d 132, 134 (1961).

Probably the latest decision on the subject is that of Fagin v. People, 484 P. 2d 1216, 1217 (Colo. 1971), where the court said:

"Defendants argue that the trial court erred in giving instruction No. 10 as follows: 'The Court instructs you that the statute prohibiting the possession of Cannabis Sativa L. applies to the possession of any amount of the drug.' While the statute does not include the word 'any,' this court has consistently held that the statute denounces the possession of *any* amount of a narcotic drug."

While the decisions of the California Court of Appeals are contrary to the majority of the courts that have passed on the question, it must be noted that California is one of two states that have not adopted the Uniform Narcotic Drug Act. See, Am. Jur. 2d, Desk Book, Doc. No. 129. This influenced the Missouri Supreme Court in the case of State v. Young, 427 S. W. 2d 510, 512 (1968) to distinguish the California decisions from those of other jurisdictions, saying:

"The first difficulty with the appellant's reliance on California

decisions is that California is one of but four jurisdictions that have not adopted the Uniform Narcotic Drug Act, the other forty-six jurisdictions, including Missouri, with slight modifications, have adopted the uniform act." [3]

In the light of the holding in the great majority of jurisdictions that have adopted the Uniform Narcotic Drug Act, and more particularly in the light of the expression of legislative intent found in the recent adoption of L. 1971, c. 937, as amended by Ex. Sess. L. 1971, cc. 38 and 48, § 17, we feel compelled to hold that Morgan and Resnick, in so far as they are based on lack of possession of a usable quantity of marijuana, are no longer tenable or controlling. It must follow that under the law as it existed prior to the adoption of L. 1971, c. 937, and Ex. Sess. L. 1971, cc. 38 and 48, § 17, the legislature must likewise have intended that possession of even an unusable quantity of marijuana was a crime and that, based thereon, the lower court's determination that possession of the amount of marijuana found in defendant's jacket is a crime must be sustained.

Some argument is made that there must be a "knowing" possession of a narcotic drug in order to constitute a crime. We need not spend any time on that argument because the inference is permissible that, marijuana having been found in a jacket shown to belong to defendant and to have been worn by him, whatever was in the jacket was there with his knowledge. The element of knowledge need not be proved from direct testimony, but may be shown by circumstantial evidence. United States v. Zumpano, 436 F. 2d 535 (9 Cir. 1970); United States v. Doyal, 437 F. 2d 271 (5 Cir. 1971); United States v. Cantu, 437 F. 2d 1080 (9 Cir. 1971); State v. Monteith, 4 Ore. App. 90, 477 P. 2d 224 (1970).

We see no need of discussing at length the sufficiency of the search warrant. It was based on information received from a reliable informant and we think it was sufficient to permit a

---

[3] Apparently, two more states have adopted the uniform act since the Missouri decision.

search of defendant's clothing. Furthermore, a new trial based on insufficiency of the search warrant at this stage of the proceeding would do no one any good.

The argument that the search warrant was issued to permit a search of one Robert Reed, Jr., instead of defendant is not persuasive. It was issued to search a person known as "Bob Jones" and defendant admits that he did use that alias at times. While there might have been some question in the minds of the officers as to whether "Bob Jones" was defendant or Reed, the description of defendant, particularly with respect to the type of clothes he would be wearing and the company he would be with, bore out the fact that the informant was referring to Robert Siirila, the defendant. We think the evidence was sufficient to enable the magistrate to make an independent judgment as to whether the search was in fact based upon probable cause. Whether the warrant described defendant with sufficient particularity is a question of fact. See, Annotation, 49 A. L. R. 2d 1209. The trial court has found that the warrant did properly describe defendant and we think that determination should be upheld.

Some question has been raised as to whether the police had the right to take defendant to the police station for an additional search after searching him on the premises where he was first found. Apparently, defendant went with the police voluntarily; and while there might be some question whether he could be compelled to go with them absent an arrest at that time, under the circumstances of this case we think that his arrest, based upon the search that was made at the police station, cannot be said to have been violative of any constitutional rights.

Much has been made of the fact that defendant was sentenced to the maximum of 20 years. Under the provisions of Minn. St. c. 242, the district court is required to commit to the Youth Conservation Commission every person who is under 21 when apprehended and who is convicted of a felony and is not sentenced to life imprisonment, and it is mandatory that the commitment to the commission be for the maximum term of law provided for

the crime for which the person was convicted. § 242.13. It is then up to the commission to determine what shall be done with the youthful offender. In all fairness to the trial court, it should be said that the court recognized this requirement of the Youth Conservation Act. In imposing sentence, the court, among other things, said:

"* * * The maximum period of imprisonment under this sentence—not under this sentence but under this statute is twenty years; but I would say that I'm really giving you that information as far as the statute is concerned. I have no conception that anywhere near that is going to be the case * * *. It is my particular concern in this sentence that there be a full investigative background, both psychiatrically and medically, for determination as to what might best be the case to assist in this matter because I definitely feel there is, if nothing else, at least an emotional problem by way of background in this matter and that's primarily the thing I have in mind, because I just have no facilities to handle it here and that's the reason it's going to the YCC. Do you have any question on that, Mr. Siirila?

"A. No, sir."

The whole purpose of the Youth Conservation Act is expressed in § 242.01, as follows:

"The purpose of Minnesota Statutes, Chapter 242, is to protect society more effectively by providing a program looking toward prevention of delinquency and crime by educating the youth of the state against crime and by substituting for retributive punishment methods of training and treatment directed toward the correction and rehabilitation of young persons found delinquent or guilty of crime."

While a 20-year sentence for possession of an unusable quantity of marijuana may seem unreasonably harsh if other provisions of the Youth Conservation Act are not considered, the realities of the case are that defendant here was not subjected to unduly severe treatment. Under § 242.19 the YCC has many

options as to what treatment should be accorded a youthful offender, from probation to incarceration. It appears from the records of the YCC that after sentence was pronounced defendant was admitted to the Reception and Diagnostic Center at Lino Lakes on December 20, 1968. On January 6, 1969, he was transferred to the State Reformatory. At the beginning, defendant had difficulty adjusting satisfactorily, but in December 1969, when the commission reviewed his progress, he was enrolled in a high school course and asked to be permitted to remain at the reformatory until he could complete that course, which he did. He graduated in June 1970 and was then granted an interstate parole and permitted to move to California to live with his mother. On June 24, 1971, he was discharged and his civil rights were restored under § 242.31, which reads:

"Whenever a person committed to the commission upon conviction of a crime is discharged from its control other than by expiration of the maximum term of commitment as provided in Minnesota Statutes, Chapter 242, or by termination of its control under the provisions of section 242.27, such discharge shall, when so ordered by the commission, restore such person to all civil rights and shall have the effect of setting aside the conviction and nullifying the same and of purging such person thereof. The commission shall file a copy of the order with the district court of the county in which the conviction occurred, whereupon the court shall order the conviction set aside.

\* \* \* \* \*

"Such orders restore the defendant to his civil rights and purge and free him from all penalties and disabilities arising from such conviction and it shall not thereafter be used against him, except in a criminal prosecution for a subsequent offense if otherwise admissible therein."

The order of the commission granting such pardon reads, so far as material:

"Now, THEREFORE, The Youth Conservation Commission does hereby discharge the said Robert John Siirila from its control.

"IT IS FURTHER ORDERED that, pursuant to the provisions of Minnesota Statutes, Chapter 242, the said Robert John Siirila is restored to all civil rights, his conviction set aside and nullified, and he is purged thereof."

If there ever was a case where the wisdom of the Youth Conservation Act has been demonstrated, it is this case. Defendant is now apparently a rehabilitated young man; so far as the laws permit, his conviction has been wiped out. If he stays out of trouble, this conviction can no longer be held against him. Everything has been done for him that can be done, and it would seem that at this time the case before us has become largely moot. While we feel that we must affirm the conviction, based upon legislative intent as we see it in view of the recent legislative act, we do so in the knowledge that the conviction has been nullified by act of the YCC so far as it can lawfully do so.

In the light of our decision on the main issue involved in this case, we see no object in discussing in detail the validity of the search and seizure or the question of probable cause for it or for an arrest. A new trial based on error in admission of evidence surely would do the defendant no good, in the light of the treatment he has received, which we have detailed above. We think it will be in the best interests of all concerned to let the matter now rest where it is.

With respect to the claim of amicus that the venue was not properly established in Hennepin County, about all we need say is we see no merit in this argument. If a crime was committed at all, it was committed in Hennepin County and venue was properly there.

The opinion of this court heretofore filed on February 5, 1971, is withdrawn and this opinion filed instead.

Affirmed.

OTIS, JUSTICE (dissenting).

The matter of finding legislative intent is not the problem I

have with this case. That question has been laid to rest by the majority opinion. What I cannot accept is a felony conviction for conduct which does not and cannot pose a threat to society or interfere with the health, safety, or morals of the public.

This defendant had in his possession 1/2800 of an ounce of marijuana, a quantity so minute it could not be chemically analyzed and could only be microscopically identified. It is not claimed that the amount was usable or salable. No attempt is made to relate the statute, as it applies to microscopic particles, to any legitimate public purpose. What we have done is approve a prison term for having in possession a substance wholly innocuous in itself but which gives rise to suspicion that defendant has been guilty of a more serious offense for which he has not been tried or convicted.

In effect, the statute presumes that possession of *any* quantity of marijuana proves beyond a reasonable doubt that defendant on some other occasion had in his possession or sold to a third person a usable amount of the drug. Such presumptions are invalid.[1]

A statute which proscribes conduct that in its nature is innocent violates due process.[2] I believe this is such a case. Although defendant has not squarely addressed himself to the question, I feel it is appropriate for us to consider the matter sua sponte. I would reverse.

---

[1] State v. Kelly, 218 Minn. 247, 15 N. W. 2d 554 (1944); State v. Edwards, 269 Minn. 343, 130 N. W. 2d 623 (1964).

[2] People v. Bunis, 9 N. Y. 2d 1, 3, 210 N. Y. S. 2d 505, 506, 172 N. E. 2d 273, 274 (1961); People v. Munoz, 9 N. Y. 2d 51, 58, 211 N. Y. S. 2d 146, 151, 172 N. E. 2d 535, 539 (1961); People v. Belcastro, 356 Ill. 144, 147, 190 N. E. 301, 303 (1934); Commonwealth v. O'Harrah (Ky. App.) 262 S. W. 2d 385, 388 (1953); State v. Labato, 7 N. J. 137, 148, 80 A. 2d 617, 622 (1951).